UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| THE ESTATE OF DAVID CONROY, et. al., | : | |
| | : | |
| | : | Civ. No. 17-7183 (RBK) (AMD) |
| Plaintiffs, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| CUMBERLAND COUNTY, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**ROBERT B. KUGLER, U.S.D.J.**

This matter comes before the Court by way of Plaintiffs, the Estate of David Conroy by and through its administrator, Jenney Ferguson, and Ms. Ferguson in her own right's (collectively "Plaintiff") Complaint. (ECF No. 1). Presently before the Court is Defendants Cumberland County and Warden Smith's motion for summary judgment. (ECF No. 136). Plaintiff filed an Opposition, (ECF No. 144), and Defendants filed a Reply, (ECF No. 147). For the reasons set forth below, the Court will grant the motion for summary judgment as to the John Doe Officers and deny the remainder of the motion.

## I.   BACKGROUND

### A.  Factual History

As the parties are intimately familiar with the facts of this case, and because the Court has already set forth the background of this matter in earlier Opinions, (ECF Nos. 42, 62, 89, 116), the Court will only state those facts necessary to address the instant Motion.

This case arises from the suicide of David Conroy, during his detention at the Cumberland County Jail. On May 23, 2017, CFG nursing staff accepted and cleared Mr. Conroy for incarceration at the jail. The nurses completed a medical intake, mental health screening, and

mental health examination, and ultimately placed Mr. Conroy on level 2 suicide watch.  On May 24, 2017, a CFG doctor continued Mr. Conroy's level 2 suicide watch.

On May 27, 2017, at 7:00 a.m., then officers Cimino and Gomez began their tours of duty. Level 2 suicide watch required them to check Mr. Conroy at least once every fifteen minutes. Cimino and Gomez "completed" the watch forms, indicating that they had performed the required checks, but the video surveillance revealed that they had falsified the relevant entries. (ECF No. 136-2, at ¶ 59).

Ultimately, Cimino testified that from 12:30 p.m., to 1:21 p.m., on May 27, 2017, he had not conducted a cell check on Mr. Conroy. (*Id*. at ¶ 104).  Gomez completed his last physical check of Mr. Conroy on 12:47 p.m. (*Id*. at ¶ 106).   When Gomez finally checked Mr. Conroy at approximately 1:24 p.m., he discovered Mr. Conroy hanging from a vent and told Cimino to open the door (*Id*. at ¶¶ 108–09).  Although the parties do not specify exactly what transpired next, according to one of Plaintiff's experts, Mr. Conroy was unresponsive, taken to the hospital, and pronounced dead on May 29, 2017.  (ECF No. 143-6, at 1).

After discovering that Cimino and Gomez had falsified their logbooks, the jail suspended them in September of 2017.  Cimino resigned in April of 2018, and Gomez resigned in March of 2018. (ECF No. 136-2, at ¶¶ 111–14).  The Cumberland County Department of Corrections referred the matter to the Cumberland County Prosecutor's Office, and a criminal investigation ensued. (*Id*. at ¶ 60).  The prosecutor's office charged Cimino and Gomez with tampering with public records and endangering another person. (*Id*. at ¶ 61).  Ultimately, Cimino and Gomez accepted a plea agreement where they had to complete a pretrial intervention program, forfeited their positions, and agreed never to hold public employment in New Jersey. (*Id*. at ¶ 62).

### B.  Policy, Custom, and Training

Warden Smith began working at the Cumberland County Department of Corrections in 2016 and became warden in February of 2017. (ECF No. 136-2, at ¶ 71–72).  Before becoming Warden, Warden Smith worked as a confidential aide to former Warden Balicki beginning in June of 2016. (ECF No. 143, at ¶ 37).  During a conversation with Warden Balicki, Warden Smith voiced his concerns about the suicide problem at the jail. (*Id*. at ¶ 38).  Nevertheless, Warden Balicki did not have any recommendations or plans to address the inmate suicide issue. (*Id*. at ¶ 39).

Warden Smith acknowledged that officers "[n]ot making their rounds" and "[f]alse reporting" were perennial problems at the jail, but one that they had "been diligently trying to correct." (ECF No. 136-11, at 34).  According to Warden Smith, "[f]rom the very beginning . . . when I sat and met with my supervisory staff and . . . talked to them about the thing[s] I wanted to implement, there were conversations about officers not making their check[s], which was a big part of some of the issues that we experienced with the suicides." (*Id*. at 9).

In the past, jail policy provided for three levels of supervision: "Level 1 Suicide Watch" which required 15-minute checks; "Level 2- Enhanced Observation" which required 30 minute checks for inmates who were "not in immediate danger"; and "Level 3-Reduced Observation" whereby the inmates had no restrictions. (ECF No. 136-2, at ¶ 32).  The suicide prevention policy requires officers to check inmates at specific times and document those checks on a suicide watch form, also known as a "close watch form." (*Id*. at ¶ 33).

In March of 2017, Warden Smith issued a memo which changed level 2 suicide watch to require checks every 15 minutes, rather than every 30 minutes. (*Id*. at ¶ 74).  That memo was meant to supersede any existing policy. (*Id*. at ¶ 75).  The jail allegedly distributed or explained the memo

during two roll calls that included Gomez, but Gomez did not recall ever receiving a copy of the memo or any announcement regarding the memo. (*Id*. at ¶ 78; ECF No. 143, at ¶ 78). Similarly, Cimino did not recall ever receiving the suicide watch memo, (ECF No. 143, at counterstatement ¶ 1), and believed that level 2 suicide watch still required checks every 30 minutes. (*Id*. at counterstatement ¶ 64).

When asked whether "caught up or wrote up" was a saying at the jail, Cimino answered, "Yes," and explained:

> [A.] It means if the book[s] aren't caught up, you're going to get an earful.
>
> Q. So what is it -- what should you do then as an officer?
>
> A. Make sure the books are filled out.
>
> Q. Whether you did something or not.
>
> A. Yes.
>
> Q. And is that, in fact, what you did?
>
> A. Yes.

(*Id*. at counterstatement ¶ 2 (quoting ECF No. 136-23, at 12:2–15)). Gomez had a similar understanding of what it meant to be caught up or wrote up. (*Id*. at counterstatement ¶ 13). Cimino and Gomez were not aware of their supervisors ever reprimanding anyone for submitting false or inaccurate information in their close watch forms. (*Id*. at counterstatement ¶¶ 3, 19). To Cimino's knowledge, supervisors never reprimanded or made an example out of officers who were caught sleeping on the job. (*Id*. at counterstatement ¶ 6).

Further, Cimino was not aware if supervisors ever checked the accuracy of their logbooks by comparing them to video camera footage. (*Id*. at counterstatement ¶ 3). Nor did Cimino recall any changes made as a result of the previous suicides at the jail. (*Id*. at counterstatement ¶ 4).

4

Similarly, if Gomez were unable to complete a watch at the appropriate time, his supervisors "would just say fill it out. . . keep it up or handle it." (*Id*. at counterstatement ¶¶ 17–18).  He further stated that supervisors had watched them do that for years, and "never said [the officers] were doing anything wrong." (*Id*. at counterstatement ¶ 17).

As to their training, Gomez testified that their initial suicide training was "very, very vague," and that the only thing he remembered was the two trainers saying, "People that are on suicide watch just want attention; they're not going to do anything." (*Id*. at counterstatement  ¶ 8).  According to Gomez, after his academy and initial training, he received no additional suicide prevention training, despite the recent suicides at the jail. (*Id*. at counterstatement ¶ 9, 15).

Officer Bermudez, the local union president, testified that the jail does not train officers on policy changes. (*Id*. at counterstatement ¶ 21).  Instead, "the supervisor calls you into the office and says here, I need you to sign this. Q. Is it reviewed with you? A. No." (*Id*.).  According to Officer Bermudez, Cimino and Gomez falsified their books, "as they were trained because they're told to either have the book caught up or you're going to get, we say in jail, you know, caught up or wrote up." (*Id*. at counterstatement ¶ 22).  As a result, Cimino and Gomez "caught the books up and it was considered perjury and now they're gone." (*Id*.)  As union president, Officer Bermudez had to address liability issues and "voiced these concerns way before," but they "were never addressed." (*Id*.).

As to the supervisors, Sergeant Mendibles and Lieutenant Martinez, they did not recall any additional suicide prevention training prior to Mr. Conroy's death.  (*Id*. at counterstatement ¶¶ 23, 29).  They also indicated that they had never conducted video reviews to see if officers actually completed their suicide watch checks and had no knowledge of anyone doing such reviews. (*Id*. at counterstatement ¶¶ 26, 27, 34).

### C.  Procedural History

On September 18, 2017, Plaintiff filed the Complaint in this case ("*Conroy I*"), naming as defendants, Cumberland County, Warden Richard Smith, former Warden Robert Balicki, CFG Health Systems, and John Doe Officers for violations of Mr. Conroy's constitutional rights and various state law claims.

As set forth in the Court's earlier Opinion:

> Former Warden Balicki filed a motion to dismiss on September 28, 2017. On February 20, 2018, CFG Health filed a motion for summary judgment on Plaintiff's medical malpractice/professional negligence claims against CFG Health.
>
> The Court granted Balicki's motion to dismiss on May 31, 2018. Plaintiff was permitted to file an amended complaint with their claims against Balicki, but they declined to do so even after the Court granted an extension of time to file the amended complaint. As such, Balicki is now dismissed with prejudice from the case.
>
> CFG's motion for summary judgment was denied in September 2018. The Court also denied CFG Health's motion for reconsideration.   While CFG Health's motion was pending, Cumberland County and Warden Smith filed a motion for partial summary judgment on Plaintiffs' state tort claims. The Court dismissed the motion without prejudice based on a failure to comply with Rule 56.1.

*Estate of Conroy by & Through Ferguson v. Cumberland Cty.*, No. 17-7183, 2019 WL 3761129, at *1 (D.N.J. Aug. 8, 2019) (citations omitted).

Thereafter, Cumberland County and Warden Smith refiled their motion for partial summary judgment, and this Court found that Plaintiff had not substantially complied with the New Jersey Tort Claims Act,  N.J. Stat. § 59:1-1 *et seq. Id*.  As a result, the Court granted summary judgment as to Plaintiff's state tort claims against Cumberland County and Warden Smith. *Id*.

During the pendency of those motions, on June 20, 2018, Plaintiff requested a 30-day extension to file a motion for leave to amend, to add Cimino and Gomez, as defendants in *Conroy*

*I*. (*See* ECF No. 50).  Judge Simandle granted counsel's request, extending Plaintiff's time to amend to July 30, 2018. (*Id*.).  Contrary to counsel's representations, Plaintiff never filed a motion to amend or an amended complaint in *Conroy I*, and requested no further extensions of time to amend.

Instead, on September 21, 2018, Plaintiff's counsel filed a new Complaint, under a new docket number ("*Conroy II*"), naming Cimino and Gomez as Defendants. (*Conroy II*, No. 18-14184, ECF No. 1).  Both complaints involve the suicide of Mr. Conroy at the Cumberland County Jail.

On November 26, 2018, Judge Donio consolidated *Conroy I* and *II* for discovery purposes only.  In *Conroy I*, Plaintiff filed a motion to consolidate the cases for all purposes, and in *Conroy II*, Cimino and Gomez filed a similar motion to consolidate.  Cumberland County opposed the motion to consolidate in each case.[1]  The motions to consolidate remain pending.

Thereafter, in April of 2020,  Cimino and Gomez filed a motion for summary judgment, contending that the doctrines of judicial and equitable estoppel precluded Plaintiff from prosecuting *Conroy II*.  The Court rejected those arguments and denied the motion for summary judgment in *Conroy II*. (*Conroy II*, No. 18-14184, ECF No. 47).

Now before the Court is Defendants Cumberland County and Warden Smith's motion for summary judgment. (ECF No. 136).  Plaintiff filed an Opposition, (ECF No. 144), and Defendants filed a Reply, (ECF No. 147).  As a result of earlier motions, Plaintiff's only remaining claims against the County and Warden Smith are her federal § 1983 claims and corresponding state constitutional claims under the New Jersey Civil Rights Act ("NJCRA").

---

[1] The County is a Third-Party Defendant and Cross-Claimant in *Conroy II*.

## II.      STANDARD OF REVIEW

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).  In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Cotton*, 572 U.S. at 657.  The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof," the moving party may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

If the moving party meets its threshold burden, the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence that may show that genuine issues of material fact exist).  The non-moving party must at least present probative evidence from which the jury might return a verdict in his favor.  *Anderson,* 477 U.S. at 257.  Where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the movant is entitled to summary judgment.  *Celotex,* 477 U.S. at 322. "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation,* 912 F.2d 654, 657 (3d Cir. 1990).

Further, under Rule 56(c)(1)(A), any party asserting that a fact is or is not in dispute must support that assertion by "*citing* to particular parts of materials in the record, including depositions,

8

documents, electronically stored information, affidavits or declarations, stipulations . . . ,
admissions, interrogatory answers, or other materials." (emphasis added).  When parties fail to
follow Rule 56, a court may "(1) give an opportunity to properly support or address the fact; (2)
consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion
and supporting materials—including the facts considered undisputed—show that the movant is
entitled to it; or (4) issue any other appropriate order." Fed. R. Civ. P. 56(e).

Stated differently, expressing a general disagreement "without identifying the facts
disputed *and* without [citing] to evidence in the record that raises an issue of fact regarding that
point, is insufficient to survive summary judgment." *Malik v. Hannah*, 799 F. Supp. 2d 355, 358
(D.N.J. 2011) (emphasis added); *see, e.g.*, *Juster Acquisition Co., LLC v. N. Hudson Sewerage
Auth.*, No. 12–3427, 2014 WL 268652, at *5 n. 4 (D.N.J. Jan. 23, 2014) (admonishing the
defendant for falsely claiming that facts were in dispute, and noting that "any statement that is not
explicitly denied with a proper citation to the record in a responsive Rule 56.1 statement is deemed
admitted."); *Walters v. Carson*, No. 11–6545, 2013 WL 6734257, at *9 n.11 (D.N.J. Dec.19,
2013).

### III.   DISCUSSION

#### A.   Section 1983 Claims

Defendants argue that summary judgment is appropriate because Plaintiff has failed to
support her municipal and supervisory liability claims under 42 U.S.C. § 1983.  To succeed on a
§ 1983 claim, a plaintiff must allege two things: first, a violation of a right under the Constitution,
and second, that a "person" acting under color of state law committed the violation. *West v. Atkins*,
487 U.S. 42, 48 (1988); *Piecknick v. Com. of Pa.*, 36 F.3d 1250, 1255–56 (3d. Cir. 1994).  The
Supreme Court has established that § 1983's definition of "person" includes municipalities and
other local government entities. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978).

9

A plaintiff may not, however, hold a local government unit "liable for the unconstitutional acts of its employees on a theory of *respondeat superior*." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014).  To hold such an entity liable under § 1983, plaintiffs must demonstrate that a local government unit adopted a policy or custom and that such policy or custom had been "the moving force" behind the deprivation of their constitutional rights. *See Monell*, 436 U.S. at 694.

Municipal policy generally requires that a local governing body's officers officially adopt and promulgate a "statement, ordinance, regulation, or decision." *Id.* at 690.  A municipal custom, although lacking the formal approval of a policy, refers to those official practices which are "so permanent and well settled as to constitute . . . the force of law." *Id.* at 691.

Under certain circumstances, a municipality's failure to properly train its employees and officers can amount to a "custom" under § 1983. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  When a plaintiff alleges that a policy "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Thomas*, 749 F.3d at 222 (quoting *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)).  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 409 (1997)).

The "first inquiry in any case alleging municipal liability under § 1983 is . . . whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Canton*, 489 U.S. at 385.  Plaintiff contends that Cimino and Gomez committed the underlying constitutional violations.

10

### 1.      Deliberate Indifference Resulting in Suicide

To state a Fourteenth Amendment[2] claim for deliberate indifference resulting in suicide, a plaintiff must show: "(1) that the individual had a particular vulnerability to suicide, meaning that there was a strong likelihood, rather than a mere possibility," that the individual would attempt suicide; "(2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability." *Palakovic v. Wetzel*, 854 F.3d 209, 223 (3d Cir. 2017).  Cumberland County may satisfy its burden for summary judgment by showing "that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.

With those principles in mind, Cumberland County appears to argue that Plaintiff cannot establish municipal liability, stemming from Cimino and Gomez's actions, if the former officers are not parties to this case.  The County cites to no authority for this proposition, and the Court has found none.  To the Court's knowledge, Plaintiff could prove that Cimino and Gomez committed a constitutional injury, without naming them as defendants in this case.

For example, Plaintiff could have theoretically settled with Cimino and Gomez prior to filing suit against the County.  In that scenario, Cimino and Gomez would not be parties to the case, but Plaintiff could still raise evidence to show that Cimino and Gomez committed an underlying constitutional violation.

---

[2] From the papers, it appears that Mr. Conroy was a pretrial detainee at the time of the events in question, but it is unclear.  The Court will proceed under the assumption that Mr. Conroy was a pretrial detainee at the time of his death.

If true, to the extent Plaintiff seeks to raise corresponding Eighth Amendment deliberate indifference claims, the Court will dismiss those claims at a later date, as they only apply to inmates who have received their conviction and sentence.

The County does cite generally to Rule 19(a)(1), and implies that Cimino and Gomez are indispensable parties, but provides the Court no further analysis on that point. (*See* ECF No. 136-1, at 15). Stated differently, the County does not attempt to prove that Cimino and Gomez are indispensable parties.[3] Accordingly, to the extent the County argues that summary judgment is appropriate solely because Cimino and Gomez are not parties to this case, the Court will deny summary judgment on that ground.

Turning then to the merits, the Court finds that genuine issues of material fact exist as to whether Cimino and Gomez were deliberately indifferent to Mr. Conroy's risk of suicide. Mr. Conroy was on level 2 suicide watch, which could show that he had a "particular vulnerability to

---

[3] Under Rule 19(a):

> a party is a necessary or required party if 'in that person's absence, the court cannot accord complete relief among existing parties.' Fed. R. Civ. P. 19(a)(1)(A). A party is also deemed necessary if the party has an interest in the action such that disposing of the interest in the party's absence might (1) 'impair or impede the person's ability to protect the interest' or (2) 'leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.' *Id.* at 19(a)(1)(B)(i)—(ii).
>
> If joinder of a 'necessary' party is infeasible . . . 'the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed.' Fed. R. Civ. P. 19(b); *see also Gen. Refractories*, 500 F.3d at 319. Factors to consider include: (1) 'the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;' (2) 'the extent to which any prejudice could be lessened or avoided by protective provisions in the judgment, shaping relief, or other measures;' (3) 'whether a judgment rendered in the person's absence would be adequate; and' (4) 'whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.' Fed. R. Civ. P. 19(b).

*Aetna Life Ins. Co. v. Found. Surgery Affiliates, LLC*, 358 F. Supp. 3d 426, 437–38 (E.D. Pa. 2018)

suicide." *Palakovic*, 854 F.3d at 223.  Plaintiff could then demonstrate that the former officers "knew or should have known" of that particular vulnerability, since they knew Mr. Conroy was on suicide watch. *Id*.  Finally, a jury could find that they acted with deliberate indifference by disregarding their duties and failing to conduct their suicide watch checks. *See id*.

The County refers to *Hopson v. Cheltenham Twp.*, No. 90-0587, 1990 WL 102883, at *5 (E.D. Pa. July 17, 1990), and *Williams v. City of Lancaster, Pa.*, 639 F. Supp. 377, 384 (E.D. Pa. 1986), for the proposition that the "failure to perform timely cell checks as required . . . does not constitute a § 1983 violation." (ECF No. 136-1, at 19).  In those cases, however, the officers were not explicitly aware of the suicide risk of the decedents, and accordingly, the failure to perform cell checks did not amount to a § 1983 violation.  In contrast, in the present case, Mr. Conroy was on suicide watch, and the officers in charge of performing suicide watch checks knew or should have known of his particular vulnerability to suicide.

Consequently, to the extent the County argues that summary judgment is appropriate because there is no underlying constitutional violation in this case, the Court will deny summary judgment on that ground.

### 2.    Policy, Custom, and Supervisory Liability

Turning then to whether the County had a policy or custom that caused Mr. Conroy's death, the County does not directly argue this point as to Cimino and Gomez. (ECF No. 136-1, at 14–16). It appears that the County assumed that the actions of the former officers could not constitute an underlying violation. (*See id*.).  That said, when applicable, the Court will consider the County's policy and training arguments as to Warden Smith to apply also to Cimino and Gomez.

In their papers, Defendants show that Cimino and Gomez: (1) received suicide prevention training generally; (2) that they should have been aware of Warden Smith's new policy which

changed level 2 suicide watch from 30-minute checks to 15-minute checks; and (3) that they consciously disregarded their duties and then falsified records in a way that showed that they understood the 15-minute cell check requirement. (ECF No. 136-1, at 17–24).  In addition to changing the level 2 suicide watch policy, Warden Smith contends that on May 24, 2017, a few days before Mr. Conroy's death, he arranged for additional suicide prevention training and provided suicide prevention booklets to Cimino and Gomez. (ECF No. 136-1, at 23).  There appears to be a dispute as to whether any of the relevant officers and supervisors attended that training, received those booklets, or received the memo that changed the suicide watch requirements. (*Compare id.*, *with* ECF No. 143, at ¶ 78, counterstatement ¶¶ 9, 5, 23, 29).

What Defendants fail to address, however, is the testimony regarding the apparently common practice of officers disregarding their suicide watch duties, forging those records whenever they did so, and doing so with the implicit or explicit approval of their supervisors. (*Id.* at counterstatement ¶¶ 2, 3, 17, 18, 19, 21, 22).

A jury could find that such practices constitute a municipal custom and that that custom had a direct causal link to, and was the "moving force" behind, Cimino and Gomez's underlying violations.  *See Monell*, 436 U.S. at 691, 694 (explaining that a municipal custom, although lacking the formal approval of a policy, refers to those official practices which are "so permanent and well settled as to constitute . . . the force of law").

As to Warden Smith, as a general rule, government officials are not liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior. See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Monell,* 436 U.S. at 691 (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); *Robertson v. Sichel,* 127 U.S. 507, 515–16 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the

nonfeasances, or negligences, or omissions of duty, of subagents or servants or other persons properly employed by or under him, in discharge of his official duties").

Instead, there are two ways in which supervisors may be liable for the unconstitutional acts of their subordinates.  First, liability may attach if a supervisor, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). Under the second approach, a supervisor "may be personally liable if he participated in violating [] rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinates' unconstitutional conduct." *Estate of Moore v. Cumberland Cty.*, No. 17-2839, 2018 WL 1203470, at *4 (D.N.J. Mar. 8, 2018).

In the present case, Warden Smith acknowledged that officers "[n]ot making their rounds" and "[false reporting" were perennial problems at the jail, but one that they had "been diligently trying to correct." (ECF No. 136-11, at 34).  Indeed, Warden Smith stated, "[f]rom the very beginning . . . when I sat and met with my supervisory staff . . . about the thing I wanted to implement, there were conversations about officers not making their check[s], which was a big part of some of the issues that we experienced with the suicides." (ECF No. 143, counterstatement at ¶ 36).

Accordingly, Warden Smith acknowledged the issue, but there appears to be a dispute as to whether Cimino and Gomez actually received any additional training or materials, and whether it remained a common practice for officers to disregard their suicide watch duties and then make false entries with the implicit or explicit approval of their supervisors. (ECF No. 143, at counterstatement ¶¶ 2, 3, 17, 18, 19, 21, 22).  As a result, in the light most favorable to Plaintiff, a

jury could conclude that Warden Smith "had knowledge of and acquiesced in [his] subordinates' unconstitutional conduct." *Moore*, 2018 WL 1203470, at *4.

Finally, Defendants contend that "Plaintiff fails to identify any 'specific training not provided that could reasonably be expected to prevent the suicide that occurred.'" (ECF No. 136-1 (quoting *Joines v. Twp. of Ridley*, 229 F. App'x 161, 163 (3d Cir. 2007)).  Although Plaintiff's Complaint and briefing are not a model of clarity, she appears to suggest that Warden Smith could have trained his supervisors to review video footage and cross-reference the footage with their subordinates' close watch forms. (ECF No. 143, at counterstatement ¶¶ 26, 27, 32, 34).  Defendants could have then explained the new policy to the subordinate officers, as well as the consequences for failing to complete their rounds—or making false entries.

Indeed, Defendants acknowledge that Warden Smith "didn't know if his supervisors were comparing video to logbooks." (ECF No. 147, at 13).  Moreover, Defendants concede that such a practice "may have not been occurring at the Cumberland County Jail," and that it was "an action that could have been taken in an effort to assure [that] proper cell checks were being done." (*Id.*). In the light most favorable to Plaintiff, a jury could find that the failure to supervise or the failure to adopt such training was a direct link that caused Cimino and Gomez to shirk their duties on the night of Mr. Conroy's death. *See Canton*, 489 U.S. at 385 (explaining the requirement for a direct causal link).

Additionally, as to the County, a jury could conclude that those failures to train or supervise, amounted to "'deliberate indifference' to the rights of persons with whom those employees will come into contact," such as Mr. Conroy. *Thomas*, 749 F.3d at 222 (quoting *Carter*, 181 F.3d at 357).

As to the failures to train, Defendants alternatively argue that Plaintiff has failed to raise evidence of a "pattern of similar constitutional violations by untrained employees," which is "ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." (ECF No. 136-1, at 23–24); *see Connick*, 563 U.S. at 62 (quotation marks omitted).  Defendants argue that Plaintiff has "failed to introduce any documents or testimony of any pattern with any other jail suicide," and improperly relies on certain evidence, such as press releases, in her Opposition. (ECF No. 147, at 10).

In considering Defendants' argument, the Court "need only consider those materials cited" in the briefs, but it may also "consider any materials in the record." Fed. R. Civ. P. 56(c)(3).  For example, a cursory review of the record reveals considerable testimony regarding the prior suicides.  Additionally, the parties' expert reports appear to rely on evidence involving the prior suicides at the jail.  Defendants paint in broad strokes and do not specifically address the evidence related to the prior suicides.  Without more, Defendants have failed to convince the Court that the record cannot establish a "pattern of similar constitutional violations by untrained employees," *or* that all such evidence is otherwise inadmissible. *Connick*, 563 U.S. at 62.

Instead, Defendants dispute the sufficiency of Plaintiff's evidence in her counter statement of material facts, (ECF No. 147, at 8–13), but it is the Defendants who must first show that no genuine issues of material fact exist.  Defendants have not met that burden here.

For all of those reasons, Defendants have not shown that summary judgment is appropriate as to Plaintiff's municipal and supervisory liability claims under § 1983.  Additionally, because the New Jersey Legislature modeled the New Jersey Civil Rights Act ("NJCRA") after 42 U.S.C. § 1983 and created a private cause of action for violations of civil rights under either the United States or New Jersey Constitutions, courts interpret NJCRA claims "analogously to §

17

1983." *Fisher v. Pratt*, No. 19-273, 2019 WL 519569, at *5 (D.N.J. Feb. 11, 2019).  Consequently, the Court will not grant summary judgment on Plaintiff's corresponding NJCRA claims.

### B.    Qualified Immunity

Defendants collectively assert that they enjoy qualified immunity from suit.  As a preliminary matter, qualified immunity protects individuals so that they can "perform their public duties with[out] unwarranted timidity or be deterred from entering [a] line of work." *Filarsky v. Delia*, 566 U.S. 377, 392 (2012).  It does not protect the government entities employing those individuals. *See Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017).  Consequently, to the extent the County contends that it can directly assert qualified immunity as a defense, the Court will deny summary judgment on that ground.

Turning then to Warden Smith, government officials are generally immune from suit for civil damages so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether defendants are entitled to qualified immunity, a two-step analysis is necessary.  First, the Court must consider whether, "taken in the light most favorable to the party asserting the injury, [] the facts . . . show [that] the officer's conduct violated a constitutional right." *Hamilton v. Leavy*, 322 F.3d 776, 786 (3d Cir. 2003) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Second, if the alleged facts support a finding of a constitutional violation, a court must "ask whether the right was clearly established." *Id.*  This means that "there must be sufficient precedent at the time of [the defendant's] action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *Bistrian v. Levi*, 696

F.3d 352, 366 (3d Cir. 2012) (citing *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001)) (alterations in original).

With those principles in mind, Warden Smith merely incorporates his previous arguments, maintaining that Plaintiff has failed to raise facts to show that he or any other officer violated Mr. Conroy's constitutional rights.  (ECF No. 136-1, at 25–27).  As set forth above, however, there is sufficient evidence to survive summary judgment on Plaintiff's supervisory liability claims.

It appears that Defendants assumed that they would succeed on the first prong and did not argue, in the alternative, as to whether Warden Smith violated a clearly established right. Accordingly, Warden Smith has not met his burden to show that he is entitled to qualified immunity at this time, and the Court will deny summary judgment on this ground.

### C.      John Doe Officers

Finally, because Plaintiff does not contest the issue, the Court will grant summary judgment as to the claims against the John Doe Officers at this time.

### IV.      CONCLUSION

For the foregoing reasons, the Court will grant in part Defendants' motion for summary judgment.  The Court will grant summary judgment as to the John Doe Officers and deny the remainder of the motion for summary judgment.  An appropriate Order follows.

Dated:  December  15, 2020

s/Robert B. Kugler
ROBERT B. KUGLER
United States District Judge